UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-333 (DWF)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)** |
| v. | |
| LUIS ANGEL GARCIA, | |
| Defendant. | |

Luis Garcia is an inmate at Lompoc FCI who recently recovered from the COVID-19 virus. He has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying solely on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion without prejudice for Garcia's failure to exhaust administrative remedies. Should the Court reach the merits, it should deny the motion with prejudice because he has not met his burden of establishing that a sentence reduction is warranted under the statute.

## Factual Background

In September 2017, Garcia was convicted of possessing with intent to distribute 4.25 kilograms of methamphetamine. Doc. No. 58. This Court sentenced him to 120 months of imprisonment, and he has served about 43 months (or 35%) of that sentence. Garcia now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP), relying solely on the threat posed by the COVID-19 pandemic.

1

## I.   BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as

events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those

who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic

4

Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 4,579 inmates to home confinement, which is an increase of 160% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/. (last accessed Jun. 26, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates like Garcia have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad

other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.   Garcia's Conviction and Request for a Sentence Reduction

Garcia possessed 4.25 kilograms of methamphetamine and a stolen gun in November 2016. PSR, ¶ 5-8. He has been in custody since his arrest in a motel room in St. Cloud, Minnesota. PSR at F.1. His sentence expires on July 2, 2025. *See* BOP Inmate Locator, https://www.bop.gov/inmateloc/ (last accessed Jun. 26, 2020).

On June 19, 2020, Garcia filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that he had contracted the COVID-19 virus. Doc. No. 60. On that date he filed, Garcia had been out of COVID-19 isolation status for about one month. *See* Def. Ex. 3 (Doc. No 62-3), Garcia Medical Records Update at 8 (describing COVID-19 virus "resolved" on May 15, 2020). Since that time, Garcia has been back to work at his culinary job in the prison. *E.g.* Gov't Ex. 1, Garcia Medical Records Update at 11 (describing minor injury "in the vegetable prep area in the kitchen" on June 10, 2020.).

## Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence

only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

8

**Argument**

This Court should deny Garcia's motion for a reduction in his sentence without prejudice because he has failed to provide evidence that he exhausted administrative remedies. Should the Court reach the merits of his motion, the Court should deny it with prejudice on either of two independently sufficient grounds. First, he has not established that "extraordinary and compelling reasons" support a sentence reduction; second, he has not met his burden to show that a reduction is warranted in light of the danger that he would pose to the community and the relevant § 3553(a) factors.

**I.     This Court Should Deny the Motion Without Prejudice Because Garcia Has Not Exhausted Administrative Remedies.**

This Court lacks authority to act on Garcia's motion for a sentence reduction at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory, and it continues to serve an important function during the present crisis.

Here, Garcia can only represent to the Court "on information and belief" that he has presented a request to the Warden of Lompoc at some point in late May 2020. *See* Doc. No. 61 and 8-9. But Section 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden

9

of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). The requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Courts in this District have consistently upheld the exhaustion requirement. *E.g. United States v. Vangh*, 2020 WL 1940808 at *3 (D. Minn. Apr. 22, 2020); *United States v. Williams*, 2020 WL 614807 at *2 (D. Minn. Feb. 10, 2020). And the vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases).

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was

lacking by providing express statutory authorization to modify otherwise final sentences.[2]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).[3]

While the government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the

---

[2] The Eighth Circuit has recognized that the prerequisites for relief under § 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *United States v. Auman,* 8 F.3d 1268, 1271 (8th Cir. 1993).

[3] Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[4]

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to release an inmate to recommend a reduction in an inmate's sentence or grant the inmate

---

[4] Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g., United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. *See also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, Garcia's motion should be denied without prejudice to refiling when he can demonstrate he exhausted administrative remedies.

**II.  Should The Court Reach the Merits, It Should Deny The Motion Because Garcia Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because he Poses a Danger to Public Safety.**

Even if this Court had authority to grant Garcia's motion for a reduction of his sentence, it should be denied for two reasons. First, he has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, he poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

14

### A. Garcia Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Garcia's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Bellamy*, 2019 WL 3340699 (D. Minn. July 25, 2019). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

Garcia is a generally healthy young man. PSR, ¶ 43 (noting no physical health concerns other than a 2016 drug overdose). His compassionate release motion is based entirely around his COVID-19 diagnosis earlier this year. But it has already been about two months since Garcia tested positive for the virus (and possibly longer since he actually became infected), and his own exhibit

15

reflects that he was released from isolation on May 15, 2020. *See* Def. Ex. 3 (Doc. No 62-3), Garcia Medical Records Update at 8 (describing COVID-19 virus "resolved" on May 15, 2020). Garcia is now back at work in the prison, as evidenced by reports of minor injuries while working in the kitchen. *See generally* Gov't 1 Ex. 1. Everyone certainly hopes that Garcia's post-COVID-19 recovery continues to be one without long-term complication, regardless of the impact on his motion for release. However, the fact that he contracted COVID-19 does not change the correct result in regards to his motion. Garcia is a young man who appears to have recovered from COVID-19 without further incident, in which case he will presumably have developed at least some level of immunity, and his situation vis-à-vis COVID-19 will be better than the vast majority of Americans.

If Garcia does develop later complications, he will be treated by BOP. And if his physical condition is later found to have substantially deteriorated as a result of any complications such that she then may be able to demonstrate "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i), he may again move for relief.

Another court in the Eighth Circuit addressed a similar scenario in *United States v. Brunston*, 18-CR-40145-KES (D.S.D., May 26, 2020). There, a 37-year-old prisoner tested positive for COVID-19 while also suffering from severe chronic medical conditions including Type 2 diabetes, asthma, hypertensive heart disease with heart failure, hypertension, sleep apnea, epilepsy/seizure disorder, and kidney disorder. *Id*. at 2. During his 14-day observation period, he did not experience coughing, muscle pain, fatigue, sore throat, loss of taste or smell, chills, or fever. *Id*. The court denied his request under § 3582(c)(1)(A), notwithstanding his elevated risk:

16

> [A]lthough Brunston has medical conditions that theoretically put him at a higher risk for severe illness, that has not been the case as of yet. It has been two weeks since Brunston tested positive, and his condition remains stable. . . . [T]he court finds that Brunston does not satisfy the criteria under USSG § 1B1.13 comment note 1(A) because his medical condition has not substantially diminished his ability to provide self-care within the correctional facility environment.

*Id.* at 6-7.

Garcia claims, without any evidence whatsoever, that "he can be re-infected and likely will be re-infected given the conditions at Lompoc." Doc. No. 61 at 2. The government is unaware of any credible medical studies that conclude with certainty whether a person can (or will) be re-infected once recovered from COVID-19. Like so much about this new disease, the period of immunity following infection is not yet understood. But Garcia's own experience proves the BOP can and does successfully treat individuals infected with COVID-19, so he is "unable to establish that [he] cannot provide self-care while in prison or that [he] would not be expected to recover should [he] become infected again with the virus." *United States v. Lemon*, Doc. No. 93 at 5, 08-cr-246 (DSD) (D. Minn. Jun. 24, 2020).

For these reasons, Garcia has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c). The motion should be denied.

### B. Garcia Still Poses a Significant Danger to the Safety of the Community

Garcia's request for a sentence reduction should also be denied because he has failed to demonstrate that he is not a danger to the safety of the community. This Court must consider all pertinent circumstances, including danger to the community should Garcia be released. Under the applicable

17

policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

Garcia would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. He turned to drug trafficking when he was "going through employment difficulties," and law enforcement found him with a very large quantity of methamphetamine and a stolen firearm. PSR, ¶¶ 11, 5-8. During this time of historic unemployment, Garcia presents no evidence that he will not return to drug trafficking upon release. Indeed, he presents no release plan whatsoever, so the Court is left without any information about what he would do or where he would live if released. Further, Garcia has been caught with amphetamine while in prison *See* Def. Ex. 1 (Doc. No 62-1). And he has not yet completed RDAP, which the Court considered crucial to his rehabilitation at sentencing. *See* Doc. No. 58.

### C. The § 3553(A) Factors Strongly Weigh Against Garcia's Release.

Before reducing a defendant's term of imprisonment, a sentencing court must not only find the existence of extraordinary and compelling reasons that warrant a reduction in sentence, it must also consider the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3582(c); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020); *United States v. Hahn*, 2020 WL 980185 at *3 (D. Minn. Feb 28, 2020). And even then, the power to reduce a defendant's term of imprisonment under § 3582(c)(1)(A) is discretionary – § 3582(c)(1)(A) provides that a court "may" reduce the term of imprisonment for extraordinary and compelling reasons. Whatever the merits of the Garcia's contentions regarding his medical condition, this Court should not grant a 65% reduction in his sentence.

Garcia's crime is a serious one, which causes great harm to communities around Minnesota. *United States v. Rodd*, 2019 WL 5623973, at *4 (D. Minn. Oct. 31, 2019) (denial based on nature of criminal conduct). Garcia already received a sentence 68 months below his Guidelines range. PSR, ¶ 60 (noting Guidelines range as 188-235 months of imprisonment). To grant him a further 60-month reduction in his sentence would create an unwarranted sentencing disparity. *United States v. Nkajlo Vangh*, 2019 WL 6907983 at *4 (D. Minn Dec. 19, 2020) (court considered defendant's medical needs at sentencing and further reduction in sentence would create unwarranted disparity).

## Conclusion

For these reasons, this Court should deny Garcia's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/Katharine T. Buzicky*

BY: KATHARINE T. BUZICKY
Assistant U.S. Attorney
Attorney ID No. 671031MA